## Emma Moennich, Appellee, v. City of Chicago, Appellant.

## Gen. No. 14,149.

1. VERDICTS—*when set aside.* A verdict which is palpably contrary to the manifest weight of the evidence will be reversed on review.

2. PERSONAL INJURIES—*when evidence as to physical condition caused by accident insufficient.* In this case it was claimed that the plaintiff as a result of the injury to her became afflicted with rheumatoid arthrites; the verdict was large and the court held that before such a verdict in such a case could be sanctioned on review, the evidence in the record must by its preponderance contain every essential element necessary to establish that the existing physical condition of the plaintiff was clearly traceable to the traumatic injury suffered as the result of her accident.

3. EVIDENCE—*when latitude should be allowed upon cross-examination.* Wide latitude should be allowed in the cross-examination of witnesses examined hypothetically.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. HOMER ABBOTT, Judge, presiding. Heard in this court at the October term, 1907. Reversed and remanded. Opinion filed March 22, 1909.

EDWARD J. BRUNDAGE and JOHN R. CAVERLY, for appellant; EDWARD C. FITCH, of counsel.

KRUSE & PEDEN, for appellee.

MR. JUSTICE HOLDOM delivered the opinion of the court.

Plaintiff recovered, on the verdict of a jury, a judgment against defendant for $10,000, to reverse which the record is brought here for our review. The cause of action is for damages resulting to plaintiff from personal injuries sustained in falling through a rotten sidewalk negligently maintained, it is claimed, by the defendant municipality.

It is argued for reversal that the verdict is contrary to the weight of the evidence; failure to direct

a verdict for defendant, as requested; that the damages awarded are excessive and the result of passion and prejudice of the jury; erroneously excluding and admitting certain evidence, and refusing to give certain instructions tendered by defendant.

We are convinced that the verdict and judgment are so palpably contrary to the manifest weight of the evidence that it is our duty to reverse the judgment and send the cause back to the court below for another trial. In so doing we shall refrain from commenting upon matters not essential to re-enforce the reasons which impel us to the conclusions to which we have arrived, or necessary, in our judgment, to enable the trial court to avoid on a retrial the errors which bring about this reversal of its judgment.

The result of the fall through the sidewalk first made itself manifest in an injury to plaintiff's right knee. The accident occurred on the morning of May 23, 1903, while plaintiff was on the way to her employment. There was no witness to the accident. She testifies she suffered pain; that she cried, but continued her journey on foot until she reached the place of her employment. She then started to work and so continued until about four o'clock in the afternoon. As she complained of her knee hurting her, Mrs. Strusacker, by whose husband she was employed, examined it, and finding it swollen applied to it some liniment and took her to the office of Dr. Maguy a short distance away, who examined her knee and prescribed rest and an application of antiphlogistine. She then returned to her home and at once took to her bed, her mother applying hot applications to the injured knee, and the next morning procured the antiphlogistine prescribed by Dr. Maguy and applied that to her knee. She remained in bed a week or more, after that time sitting up and resting her foot on a chair, and so continued for four or five weeks, after which she went limping around the neighborhood of her residence. Dr. Maguy visited plaintiff but once—the day

succeeding that of the accident. Some time after the accident plaintiff visited Dr. Maguy's office and complained of a pain in her side. In the middle of September, 1903, plaintiff started to work as a dressmaker and continued to work as such until May, 1904. She walked to and from her work, a distance of about six blocks. Then she went to Benton Harbor, Michigan, and worked on a fruit farm five miles distant from Benton Harbor, returning to Chicago the following July, after the strawberry, raspberry and cherry picking was over. She then worked for Mrs. Stoltz, at Washington Heights, doing general housework and swept, washed, and scrubbed for the family. In August she cooked, scrubbed, and washed for Mrs. Frost in Woodlawn, Chicago, and so continued to do for about one year. From August to November, 1905, she remained at her home, and after that worked for Mrs. Shiffer, doing substantially the same character of work that she had done for Mrs. Stoltz and Mrs. Frost. At Christmas, 1905, she did general housework in the family of her brother at Goodenow in this state, and in March, 1906, returned to Chicago and went to work for Mrs. Justice, doing the family housework for two weeks. After leaving Mrs. Justice she stayed at her home until January, 1907, when she went to a sanitarium at Milwaukee and remained there for about ten weeks. While at the sanitarium she took medicine inwardly and baths and massage. Prior to that her knee grew worse and troubled her so much that in July, 1906, she took to her bed and remained there until November of that year. While the doctor at the sanitarium did not tell her what ailed her, he told her mother that she was suffering from articular rheumatism in her hands. Plaintiff testified that the only medical treatment from the time of the accident to the trial received by her, aside from Dr. Maguy, was from Dr. Hulett, who treated her for cold and chills in August and September, 1905; a Dr. Lotz, who treated her for her knee, and a Dr. Webb, who treated

her for her knee, foot and back in May, 1906. Neither of the three doctors last named appeared to testify upon the trial, nor was any reason assigned for their absence. Dr. Stack, who treated her at the Milwaukee sanitarium for ten weeks, was not called as a witness. Some of plaintiff's neighbors and family testified that after the accident she limped and had rheumatism in her arms, joints and legs, and that at times her hands swelled, and some of the people for whom she worked testified that she limped and complained of pains in her hands, arms and joints, and of rheumatism. Dr. Maguy was the only attending physician produced upon the trial, and his evidence was confined to the condition of plaintiff's knee and his treatment of it. He was not interrogated concerning the causes producing the physical condition in which she claimed to be at the time of the trial. Three medical men—Dr. Murdock, Dr. Ballard and Dr. Krost—were produced as medical experts, and testified as to plaintiff's physical condition and its producing cause. They each examined her a few days prior to the trial, for the sole purpose of qualifying themselves to testify as medical experts. Their evidence developed that plaintiff's right knee was stiff and the leg almost at a right angle to the thigh; that the leg could not be straightened; that owing to an enlargement of the condyles of the thigh-bone and a slight thickening of one of the ligaments, the joint was larger than that of the left knee; that the left ankle and elbow and the wrists were swollen and that there was ankylosis of the left elbow, which was drawn up at right angles in the same position as the right knee. Some of these witnesses intimated that such condition might be attributable to tuberculosis of the several parts. Medically, they termed this condition *rheumatoid arthrites,* which is a rheumatic inflammation of the joints. There was also present synovitis, which is an inflammation of the synovial membrane of a joint. The medical men do not disagree about the condition of plaintiff, but

as to its superinducing cause they are in hopeless conflict.

Counsel have, throughout the record and in the abstracts and briefs, fallen into a misnomer in designating the disease from which plaintiff suffers. It is, as above stated, *rheumatoid arthrites,* as the physicians unquestionably defined it—not *rhomboid arthrites,* as appears in all the papers in the cause wherever it is referred to. "Rhomboid" does not pertain to any ailment of the human body, but is a geometrical term applied to an oblong figure, the longer sides of which are horizontal and parallel and the shorter sides oblique and parallel, giving two obtuse angles and two acute angles; an oblique-angled parallelogram. See International Ency.—"Rhomboid".

That plaintiff is the victim of the most painful and permanent form of rheumatic condition is not seriously in dispute. That she is afflicted with the deformities in her knee, leg and arm, as detailed by her medical expert witnesses, there is but little room to doubt, taking into account the countervailing evidence of the defendant's expert medical men, Drs. Doane and Hall, on this subject. Dr. Doane testified that he examined plaintiff and found her suffering from rheumatoid arthrites, affecting the right knee-joint, the left ankle and right wrist, the first joint of the little finger, the second joint of the thumb, the left elbow. The right knee-joint was stiffened and at right angle with the bones of the leg and thigh, with very little, if any, "flexion"; the right wrist was in an ankylosed condition, much bent and swollen; a joint in the little finger of the right hand was immovable, and the thumb joint was partially so; the left elbow was likewise in an ankylosed condition and stiff. Dr. Hall testified to having found plaintiff afflicted with about the same difficulties as detailed by Dr. Doane. Rheumatoid arthrites, Drs. Doane and Hall gave as their professional opinion, arose from faulty elimination of the waste and poisonous substances of the body; also, that

any germ which causes disease in the body by inflammation and creates an inflammation in the joints, is medically termed rheumatoid arthrites. That traumatism does not cause rheumatism, these medical men also stated as their opinion.

The theory of counsel for plaintiff, and upon which the cause was tried, is, that the injury to the knee caused by the fall through the sidewalk is the primary and efficient cause of the rheumatoid arthrites from which plaintiff was suffering at the time of the trial, and that such condition is traceable to the injury sustained by plaintiff at the time she fell. Upon this theory, and none other, did the jury award the very substantial sum which they returned in their verdict as damages. For the apparent injury to plaintiff's knee, suffered at the time she fell, a comparatively moderate sum would have been full compensation. Therefore, before so large a verdict can be sanctioned on review, the evidence in the record must by its preponderance contain every essential element necessary to establish that the present physical condition of plaintiff is clearly traceable to the traumatic injury to the knee suffered as a result of her fall through the defective sidewalk. This must be so, even upon the assumption that the city was guilty of the negligence charged. We are not satisfied that the evidence of plaintiff, even if uncontradicted, can be held to trace her present physical ills to the unfortunate fall. The evidence relied upon to support such theory is altogether speculative and remote, and falls far short of establishing that such conditions are directly attributable to the injury to her knee, or in any satisfactory manner traceable to it. The two medical practitioners, Drs. Korst and Ballard, who testified for plaintiff, had no personal knowledge of plaintiff or the progress of her ailments. They testified as experts, making a physical examination of her but a short time preceding the date of the trial, and while they, in answer to hypothetical questions, attribute her physical dif-

ficulties to the original injury to plaintiff's knee, still they are met with equally as reliable medical experts, whose opinions to the contrary are entitled to quite as much respect and reliance as evidence as are the opinions of plaintiff's physicians. On this contro- verted point plaintiff cannot be said to have the pre- ponderance of the proof. Without such preponder- ance she is not entitled to recover compensation for the ills which now afflict her person, on the theory that they are traceable to her fall through the side- walk. Moreover, we are impressed with the improba- bilities of the theory of plaintiff's medical experts from the fact, among others, that the more serious symptoms of plaintiff's afflictions did not develop until a remote time after the accident. There was no abrasion of the skin at any time, which rendered infection from without possible. The germ theory, therefore, has no support in the evidence, making to our minds more probable the theory that the infection was from within and came about through poisons en- gendered in the system of plaintiff, owing to a failure of a natural elimination of waste substances in her body. This would seem to be a reasonable solution, from the further fact that the trouble is not confined to the injured limb, but has affected many of the joints of her limbs. Between the time of the accident and the manifestation of the more serious symptoms, plaintiff performed work of a hard and continuous nature, both in the household and in the field, incom- patible with the claim that she suffered during such time with pain, inconvenience or impairment of the motion of her injured knee. The accident occurred May 23, 1903; the trial commenced April 3, 1907, nearly four years from the date of the accident; yet the examination of plaintiff's physicians was confined to the injured knee, the other organs similarly af- flicted not being referred to, and the rigidity and stiffness of this knee-joint being assumed to have developed within six months of the trial. Still, on cross-

examination, Dr. Krost gave it as his opinion that plaintiff's joints, left elbow, left ankle and wrists, were afflicted with the same disease he found in the right knee, being the knee that was injured in the fall. We regard the expert medical testimony of plaintiff as to the more serious ailments affecting her to.be mere hypothetical conjecture of so uncertain and unreliable a nature as to be unsafe for either court or jury to adopt as a basis for the admeasurement of damages.

There were certain limitations erroneously, we think, fixed by the court to the cross-examination of plaintiff's physicians. Wide latitude ought to be allowed in the cross-examination of witnesses examined hypothetically, as in this case, and to rule out questions referring to rheumatic conditions of plaintiff on the theory that the presence of rheumatism in plaintiff was assumed in the cross-question, borders on the absurd, when it so clearly appears that by whatever medical term or phrase plaintiff's ills may be designated, they are all more or less of a rheumatic character and attributable to rheumatic conditions. Such is plainly apparent in nearly every item of medical testimony. This error can be avoided on a retrial.

The objection to instruction 14 is without force, as the substance and important part of that instruction were contained in one given at the instance of appellant.

The verdict and judgment are so manifestly contrary to the probative force of the evidence that they cannot be maintained. Consequently the judgment of the Superior Court is reversed and the cause remanded for a new trial consistent with the views above expressed.

*Reversed and remanded.*